CALIFORNIA DELTA FARMS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9820. Promulgated May 11, 1927.

1. Value of lands acquired for stock and other considerations determined as of date of acquisition and at March 1, 1913.

2. Petitioner's statutory invested capital for certain taxable years determined.

3. Petitioner caused the formation of certain reclamation districts made up of lands of which it was the owner, under the laws of California, and accepted warrants of such districts in payment for easements for right of way purposes, for personal property owned by it, and for the purposes of completing the reclamation works which it had theretofore undertaken. Such warrants created valid statutory liens upon lands owned by the petitioner,

and none other, for the face value thereof. *Held*, that the petitioner realized no taxable gain from the transactions.

4. Amount of deductible loss resulting from exchange of properties determined.

*M. F. Mitchell, Esq.*, for the petitioner.

*George G. Witter, Esq.*, and *A. Calder Mackay, Esq.*, for the respondent.

The Commissioner has determined deficiencies in income and profits taxes for the years 1918, 1919, and 1921 in the respective amounts of $584,931.44, $57,243.96, and $5,885.98 or a total of $648,061.38. The issues are: (1) The value at date of acquisition of certain lands and personal property purchased by the petitioner for stock and other considerations at the date of incorporation, the value of such assets at March 1, 1913, and the value of certain of such lands in the years 1918, 1919, and 1921; (2) the amount of statutory invested capital to which the petitioner is entitled in the computation of its tax liability in the years 1918, 1919, 1920, and 1921; (3) whether the petitioner realized taxable income in the transfer of certain of its assets to reclamation districts in 1918 and 1919; (4) whether the petitioner realized taxable gain or sustained deductible losses by the transfer of certain of its lands to other parties and by the exchange of one tract of land for another similar tract of less acreage. The petitioner also raises certain issues concerning the Commissioner's adjustments of its income and expenditures in the year 1920 and includes such year in the allegations of error in its petition for redetermination.

### FINDINGS OF FACT.

Petitioner is a California corporation organized in 1912. Its headquarters are at Los Angeles and other offices are at San Francisco and Stockton. At the date of incorporation it acquired by purchase from C. H. Condee title to certain personal property and to approximately 37,980 acres of partly reclaimed swamp and overflowed land in San Joaquin and Contra Costa Counties, California, a short distance east of Stockton and all within the delta of the San Joaquin River, for which it paid the grantor 74,989 of its 75,000 shares of capital stock (par value $100) and $1,334,000 par value of 6 per cent gold bonds. It assumed the payment of outstanding bonds amounting to $1,550,000, covering certain of the personal and real property purchased, and such other indebtedness as existed against the property at the date of purchase. The personal property consisted of eleven dredges, one floating pumping plant, boats, barges, launches and tugs, and bills receivable amount-

ing to $200,000 in excess of the bills payable assumed by the grantee. The cash value of the land so acquired was $7,627,400.

On December 3, 1912, the directors of the corporation adopted a resolution providing for the issue of 3,500 one thousand dollar twenty-year gold bonds, and on the sixth of the same month all the stockholders filed with the secretary their written consent thereto. Two thousand seven hundred and fifty of such bonds were issued and outstanding at the close of 1917. One thousand three hundred and thirty-four of these were transferred to the grantor in satisfaction of the contract between him and the petitioner. Bonds in the amount of $1,050,000 were used in paying off mortgages on portions of the land, some of which were assumed by the corporation at the time of purchase and one or more others which were executed by its secretary a short time after the purchase was made.

A large part of the land purchased had been reclaimed prior to the sale, and the company continued the work of reclamation immediately and as rapidly as possible thereafter. For convenience in reclamation the total acreage was divided into ten divisions, as follows: Bacon Island, Bishop tract, Empire tract, Holland tract, King Island, Mandeville Island, McDonald Island, Medford Island, Orwood tract, and Webb tract. On March 1, 1913, no reclamation work had been done on the Medford tract and very little on Bacon Island and Mandeville Island. It cost $116.10, $64.07, and $78.94 per acre, respectively, to complete the work on these three tracts. The cost per acre for completing the work on three other partially reclaimed tracts was as follows: Bishop, $45.25; King Island, $25.44; McDonald Island, $34.69.

The March 1, 1913, values of the several tracts owned by the company on that date, were as follows:

| Name of tract | Number of acres. | Value per acre. | Total value. |
|---|---|---|---|
| Bacon Island | 5, 500 | $185 | $1, 017, 500 |
| Bishop Tract | { ¹ 2, 100 | 200 | 420, 000 |
|  | ² 570 | 80 | 45, 600 |
| Empire Tract | 3, 750 | 250 | 937, 500 |
| Holland Tract | 4, 200 | 250 | 1, 050, 000 |
| Mandeville Island | 5, 500 | 170 | 935, 000 |
| McDonald Island | 6, 160 | 180 | 1, 108, 800 |
| Medford Island | 1, 200 | 125 | 150, 000 |
| Orwood Tract | { ¹ 2, 100 | 250 | 525, 000 |
|  | ² 1, 100 | 80 | 88, 000 |
| Webb Tract | 5, 400 | 250 | 1, 350, 000 |
|  | 37, 580 | ---------- | 7, 627, 400 |

¹ Lowland　　　　² Upland.

The cost of reclamation work done between March 1, 1913, and the transfer of the reclamation works to the first reclamation districts organized was $1,192,652.82. Other than capital expenditures there

was no increase in delta land values between March 1, 1913, and the first taxable year.

At the beginning of 1917, the petitioner's bonded indebtedness was $2,750,000. Under the terms of its bonds and mortgage, the taxpayer was required to deposit with the trustee under the mortgage, $100,000 per year beginning with the year 1917, for the creation of a sinking fund. It could not convey the title of its lands except by paying to the trustee $100 for each acre to be conveyed. There were certain other burdensome requirements in this instrument which led the petitioner to seek some method by which it could change the form of its evidence of indebtedness. For these and other reasons it worked out a plan to refinance its outstanding obligations and to secure funds for the completion of the reclamation works. It divided a large part of its land into seven separate tracts which it caused to be organized as reclamation districts, and thereafter secured the issuance of reclamation warrants amounting to $3,340,000 against the several districts. These warrants were liens against certain specified lands within each of the several districts, in amounts agreed upon by the petitioner according to the benefits to such lands from the reclamation works. They represented the expenditures theretofore made and certain estimated expenditures considered necessary for the immediate future to place the reclamation work in a thoroughly good condition. Following is a memorandum prepared by the petitioner and bearing the date of July 13, 1918, giving the number and name of each district and showing certain facts and estimates in detail:

| District number. | Island. | Acres. | Estimated expenditures to date. | | Future expenditures. | | Total debt. | |
|---|---|---|---|---|---|---|---|---|
| | | | Per district. | Per acre. | Per district. | Per acre. | Per district. | Per acre. |
| 2024 | Orwood | 3,600 | $275,000 | $76 | $50,000 | $14 | $325,000 | $90 |
| 2025 | Holland | 4,293 | 375,000 | 87 | 55,000 | 13 | 430,000 | 100 |
| 2026 | Webb | 5,523 | 475,000 | 86 | 60,000 | 11 | 535,000 | 97 |
| 2027 | Mandeville | 5,438 | 400,000 | 75 | 135,000 | 25 | 535,000 | 100 |
| 2028 | Bacon | 5,625 | 475,000 | 84 | 85,000 | 15 | 560,000 | 99 |
| 2029 | Empire | 3,708 | 350,000 | 94 | 25,000 | 17 | 375,000 | 101 |
| 2030 | McDonald | 6,142 | 500,000 | 81 | 80,000 | 13 | 580,000 | 94 |
| | | 34,329 | 2,850,000 | 83 | 490,000 | 14 | 3,340,000 | 97 |

This memorandum became a part of an agreement dated July 29, 1918, entered into between the California Delta Farms, Inc., and certain bankers for the financing of the company and the payment of its existing bonded indebtedness. The following from pages two and three of the memorandum are material facts relating to the matters herein at issue:

As fast as the aforementioned seven districts issue warrants and these warrants become the property of the Delta Farms in payment for the levees, canals, etc., these warrants, in the aggregate amount in face value of $2,850,000, will be deposited by the Delta Company with the Trustee as further security for the present outstanding bonds; which warrants may be used by the Delta Farms in payment, par for par, for all or any part of the seven Reclamation bonds purchased by the Delta Farms Company at the public sale thereof.

The Delta Company to agree to surrender to the Trustee $750,000 First Mortgage Delta bonds at par and accrued interest in exchange for a like amount of Reclamation District bonds at par and interest.

The purchase, at the public sale, by the Delta Company at par and accrued interest of the entire amount of $2,850,000 of Reclamation District bonds and the deposit thereof with the Trustee under the Delta First Mortgage with instructions which will permit of the delivery of $750,000 as above and $2,100,000 pro rata for $2,000,000 Delta Company First Mortgage 5s from time to time, but in such a way that the securities now held by Delta bondholders will not be depreciated. The bankers to enter into an agreement with the Delta Company and the Trustee, that the Bankers will deliver to the Trustee $2,000,000 Delta bonds in exchange for $2,100,000 Reclamation bonds, legal for savings banks, that is to say, for every $10,000 of Delta bonds delivered to the Trustee, or $10,500 of cash deposited to retire Delta Bonds, $10,500 of Reclamation bonds will be issued to the bankers, the accrued interest on each exchange to be adjusted in cash. In consideration of this agreement the Delta Company will pay the bankers a sum of money equal to $40,000 to be paid to the bankers in sums of $2,000, as each $105,000 of Reclamation Bonds are delivered by the Trustee. This agreement to continue in force and effect until all the Delta Bonds have been surrendered to the Trustee, or the sum of $1,050 and accrued interest has been deposited by the Bankers with the Trustee for each outstanding Delta Bond undelivered.

Recognizing the importance of the retirement of the Delta bonds to enable the Delta Company to subdivide and sell its land, the bankers agree to secure the surrender to the Trustee of the $2,000,000 Delta bonds within six months after they are advised that the Reclamation District bonds have been properly authorized and approved by the Banker's attorneys and deposited with the Trustee under the mortgage, or to deposit the aforesaid $1,050 interest for each bond not so then delivered.

The bankers shall have the option to purchase all or any part from time to time of the $2,100,000 Reclamation bonds deposited with the Trustee, by paying to the Trustee therefor, for the benefit of the Delta bondholders, a sum of cash equal to par and accrued interest of the bonds so purchased, on all of which purchases the bankers shall receive the same $2,000 payment from the Delta Company for each $105,000 Reclamation Bonds purchased as on the exchange of the Delta Bonds.

Because of delay in the issuance of bonds for McDonald Island, the contract between the bankers and the company was modified somewhat in November, 1918, but the change does not affect the facts material to this appeal.

The company's deeds and bills of sale to the districts specify the consideration paid by each district as follows:

| Number of district. | Name of district. | Consideration, deed for easement. | Consideration, bill of sale for personalty. | Total. |
|---|---|---|---|---|
| 2024 | Orwood | $238,500 | $34,000 | $272,500 |
| 2025 | Holland | 350,202 | 22,300 | 372,502 |
| 2026 | Webb | 446,525 | 25,975 | 472,500 |
| 2027 | Mandeville | 375,140 | 21,000 | 396,140 |
| 2028 | Bacon | 449,000 | 23,500 | 472,500 |
| 2029 | Empire | 327,650 | 20,500 | 348,150 |
| 2030 | McDonald | 461,025 | 36,000 | 497,025 |
| | Total | 2,648,042 | 183,275 | 2,831,317 |

The deed for No. 2030 is dated December 26, 1918, but the acknowledgment was taken January 28, 1919.

These deeds reserved the fee to the petitioner and conveyed only personal property and easements for reclamation purposes to the districts. The consideration received had no relation to the value of the property transferred, but was determined by the amounts deemed necessary by the petitioner to refinance its obligations and to cover the estimated cost of reclamation work that remained to be done.

The reclamation district warrants were issued in payment of assessments made by three commissioners appointed by the boards of supervisors of the counties in which the land lies. The commissioners divided the reclamation districts into tracts, if deemed advisable, and apportioned and assessed the amount necessary to be raised for the complete reclamation of each district among these tracts in proportion to the benefit that each would receive. The warrants issued on each assessment became a lien on all the land of the tract against which the assessment was levied. No assessments were levied against any lands owned by any persons except the California Delta Farms, Inc., and the three trustees originally appointed in each district and warrants were issued against these only. The deeds conveying title to the reclamation districts recited that the payments on account of realty were for easements for right of way purposes as follows:

For reclamation, including drainage and irrigation purposes, that strip of land 150 feet wide, extending around the entire district its outer line coinciding with the outer base of the levee.

For levee purposes and as a source of water supply and for use in the maintenance and construction of reclamation and as sources of material for such work: All portions and parcels of land which lie outside of said 150 foot strip but within the district.

For irrigation and drainage canals and purposes: Strips of land 75 feet in width and lying equally on each side of the center line of the main drainage canals of 20 feet or more in width as said main drainage canals now exist including said * * * canals.

The district warrants were duly signed and issued by the district trustees. California Delta Farms District Reclamation $1,000 bonds aggregating $2,850,000 were issued and advertised to be sold at public sale. The secretary of the Farms Company bid them in for the

company and gave district warrants, dollar for dollar, in payment therefor.

The $2,850,000 of district reclamation bonds were deposited as required by the agreement with the trustees under the original Delta Company mortgage. Of this amount $2,100,000 was used for the retirement of the $2,000,000 Delta Company bonds held by parties not associated with the Farms Company. A commission of $40,000 due the bankers for financing and conducting the deal was paid in cash. The remaining bonds in the amount of $750,000 were exchanged for Delta Farms Co. bonds of equal par value. These transactions entirely liquidated the old mortgage indebtedness and substituted therefor a bond issue which was $100,000 greater in amount.

In its income and profits-tax return for 1918 the petitioner reported net income in the amount of $132,688.81. Upon audit of such return the Commissioner added to gross income the amount of $915,596.41 as profits realized from the sale of capital assets to reclamation districts, made other minor adjustments not in controversy, reduced the invested capital of the petitioner in the amount of $4,044,678.37, and asserted a deficiency of $584,931.44.

In the year 1919 the petitioner caused its remaining lands to be organized into three reclamation districts, which issued warrants to it in payment for lands and chattels conveyed to them in deeds similar in terms to the conveyance made to the seven districts organized in 1918. The acreage of lands to which easements were granted for right of way purposes and the consideration therefor were as follows:

| District. | | Acreage conveyed | Consideration. | |
| Number. | Name. | | For land. | For personalty. |
|---|---|---|---|---|
| 2041 | Medford Island | 182.09 | $106,574 | $3,000 |
| 2042 | Bishop Tract | 185.00 | 116,760 | 8,000 |
| 2044 | King Island | 252.08 | 257,000 | 15,000 |
| | | | 480,334 | 26,000 |
| Aggregate consideration | | | | 506,334 |

The value at March 1, 1913, of the lands upon which easements were granted was as follows:

| District. | | Acreage. | March 1, 1913, value. | Total value. |
| Number. | Name. | | | |
|---|---|---|---|---|
| 2041 | Medford Island | 182.09 | $125 | $22,761.25 |
| 2042 | Bishop Tract | 185.00 | 200 | 37,000.00 |
| 2044 | King Island | 252.08 | 180 | 45,374.40 |
| | | | | 105,135.65 |
| Add value of personal property | | | | 24,000.00 |
| Aggregate value | | | | 129,135.65 |

Lee A. Phillips, president of the Empire Navigation Co., was a heavy purchaser of the San Joaquin River Delta lands. In 1910 he sought to purchase the whole of McDonald Island but found that Maurice Zuckerman held an option on that part of it known as the Henning tract. The two agreed that Phillips should acquire all the land and sell the Henning tract to Zuckerman at $125 per acre. Phillips bought, but having secured the conveyance, delayed putting his contract with Zuckerman into writing. Two other neighboring tracts were for sale. Zuckerman knowing that Phillips intended to buy them secured an option on one of them. Phillips then put the verbal agreement of sale and purchase of the Henning tract into writing, naming himself as party of the first part and E. M. Weyl and M. Zuckerman as parties of the second part, and was permitted to purchase the other two. The writing was made in 1912; was an executory contract for sale and purchase, and the consideration named was $125 per acre. In October, 1913, a little more than a year subsequent to the purchase of the land by the California Delta Farms Company, Inc., the petitioner took up the Phillips contract and executed another in lieu thereof, which was identical except as to the names of the grantors and the number of acres. Each provided that title should pass after payment in full. Such payment had not been made when District No. 2030, McDonald Island, of which the Henning tract was a part, was organized; consequently no title deed in favor of Zuckerman had been executed. Within the year 1919 final settlement of all indebtedness was made and a deed of conveyance in fee was executed by the company to Weyl and Zuckerman. This was the only conveyance executed in favor of Weyl and Zuckerman. The company retained the bonds assessed against the Henning tract and credited Weyl and Zuckerman with their par value as part payment for the land. The consideration of $125 per acre agreed upon in the 1910 verbal contract and the two written contracts of 1912 and 1913, *supra*, was the price in full finally received.

In May, 1919, the petitioner exchanged Mandeville Island containing 5,430 acres for King Island containing 3,290 acres. The value of Mandeville Island at March 1, 1913, was $170 per acre and reclamation improvements at a cost of $70 per acre were made prior to the exchange. The parties stipulated that the reclamation district including all the land on Mandeville Island at the date of exchange had an outstanding bonded indebtedness in the amount of $396,140 which the grantee assumed. The value of King Island at date of exchange was $250 per acre.

In its income and profits-tax return for the year 1919 the petitioner reported net income in the amount of $253,663.04. Upon audit of the return the Commissioner added to gross income the amount of

$223,488.08 as profits realized from the sale of capital assets and the amount of $378,862.84 as profit realized from the exchange of Mandeville Island for King Island, made other additions and deductions not here in question, reduced the petitioner's invested capital in the amount of $4,044,678.37 and asserted a deficiency of $57,243.96.

In its income and profits-tax return for 1920 the petitioner reported an operating loss in the amount of $35,162.75. Upon audit of such return the Commissioner made many adjustments, ascertained a net loss in the amount of $63,370.32 and found no deficiency or tax liability.

As a part of the procedure in organizing its lands into reclamation districts and for the purpose of conforming to the California Civil Code providing for the creation of such districts, the petitioner deeded separate tracts of its land of 2½ acres each in each of the proposed districts to G. A. Atherton, George M. Burton and J. C. McCarty, and such deeds were duly recorded. Immediately afterwards such tracts were deeded back to the petitioner by the said grantees but such deeds were not recorded prior to the organization of the reclamation districts in which said tracts were severally situated.

During the year 1921, the petitioner sold or contracted to sell numerous parcels of its lands to various purchasers, but included no profits from such sales in its gross income in its income and profits-tax returns for such year. Upon audit of such returns the Commissioner added the amount of $135,246.95 to gross income as profits on the sale of lands, made other minor adjustments not in controversy and asserted a deficiency in the amount of $5,885.98.

OPINION..

LANSDON: The issues involved in this proceeding are sufficiently set forth in our preliminary statement, *supra*. We shall discuss and decide such questions in the order there stated, except to hold that we have no jurisdiction over any controversies relating to 1920, a taxable year in which no deficiency is asserted. *Appeal of Cornelius Cotton Mills*, 4 B. T. A. 255; *Appeal of W. H. Morefield*, 4 B. T. A. 394.

The contending parties introduced many witnesses to prove value of the lands of the petitioner at the date of acquisition and at March 1, 1913. We have used great care in the consideration of the weight of the opinion evidence so adduced. We are convinced that the computation set forth in our findings of fact above represents the fair cash value of the assets acquired at date of purchase and at March 1, 1913. We are also convinced that there was no appreciation in the value of Delta Farm lands between March 1, 1913, and the dates of the transfers, sales and exchanges upon which the

Commissioner bases his assertions of tax liability arising from gain realized from such transactions.

Having determined that the land taken into the petitioner's assets at date of incorporation had a cash value in the amount of $7,627,400, and the parties having stipulated that the cost of reclamation work done by the petitioner between March 1, 1913, and the date of the first transfer to the reclamation districts in 1918 was $1,192,652.82, we conclude that the petitioner is entitled to have the sum of these two amounts less bonds and other evidence of borrowed capital assumed, included in the computation of its statutory invested capital for profits tax purposes in each of the taxable years. The petitioner admits that the Commissioner correctly adjusted its invested capital for the taxable years except as to the value of the land acquired for stock at date of organization. The correct invested capital in accordance with our findings is left for determination under Rule 50.

It is not disputed that the reclamation districts in question were properly and legally organized under the laws of California. No shadow of invalidity darkens any of the processes either of organization or operation of such districts. We are of the opinion that the series of transactions relating to the organization and bonding of the reclamation districts; the sale of the easements and personal property to the several districts; the assessments against certain land owned by the company within the several districts; the issuance of warrants against the funds derived from the assessments; the issuance, sale and purchase of district reclamation bonds as provided for in section 3480, California Political Code of 1922, and the exchange of $2,850,000 face value of these reclamation bonds for outstanding Delta bonds amounting to $2,750,000 face value were in fact one business deal and should be so considered, as the facts clearly indicate they were intended by the petitioner as a means to extricate it from an intolerable situation and place the petitioner on a more efficient working basis. To effectuate this condition it incurred an additional bonded indebtedness of $100,000, paid $40,000 in cash to its brokers for financing and engineering the exchange of bonds, and incurred numerous other expenses. These amounts were sacrificed as a pawn for a better position on the board, and this better position seems to have been the only gain. Without it the petitioner would have been in no better condition at the end of the deal than it was at the beginning. For every cent it received from any one of these reclamation districts or otherwise as a result of these transactions it gave in return an obligation to pay a like or greater amount secured by a lien upon its lands within the districts.

The case comes clearly within the decision in *Rindge Land & Navigation Co.*, 2 B. T. A. 1179. A quotation from that case is especially

pertinent here. At page 1188 the Board said " If we read the California statutes aright, it was not contemplated that the landowner should be deprived of anything by the organization of reclamation districts. On the contrary, the landowner, by its vote in dollars of value, was to control the district. The district was its agent, created at its request, and vested with certain powers by the State, only because those powers were necessary to perform certain acts for the benefit of the landowner. * * * Where there is but one landowner, as in this appeal, a reclamation district is nothing more than a legal fiction—an instrument created to permit the owner to issue bonds for its own purposes, and an entity which does not seem to come within any definition of person, partnership, corporation, or association, contained in the Revenue Act of 1918." In the present case the organization of the districts and all that followed up to and including the issuance of the warrants, was simply a means to the accomplishment of an end—one part of an operation as clearly related to the others as are the different acts of a surgical operation to each other—all parts of one harmonious whole.

It may be noted that the lands of each individual owner were assessed separately, even the 2½-acre tracts of the trustees, and that the assessments were made in proportion to the benefits already derived and to be derived from the reclamation work. This necessitated a separate accounting with each of the then owners of the land and the payment to each owner of his share of the money for which his property was assessed, either in reclamation work or in specie. But every cent thus received must first be paid in by the owner, either directly or by the creation of a debt of equal or greater amount. Neither the sale of the property to the districts nor any other of these transactions, nor all of them was at the time productive of taxable income.

The only possible variation between the basic facts here and in the *Rindge* appeal is raised by the Commissioner's contention that at the time of the organization of the districts and the transfer of the petitioner's assets thereto in exchange for bonds, there was one considerable tract that was owned by Weyl and Zuckerman who were not parties to the organization and whose lands if then so owned were security for bonds issued against them.

It is disclosed by the evidence that the petitioner acquired the Zuckerman land subject to a contract of sale at $125 per acre coupled with the condition that it must complete the reclamation works thereon at its own cost. This contract to sell was voluntarily renewed by the parties to it and provided that Weyl and Zuckerman should enter into possession and use in 1914, that they should make certain payments specified as to due dates and amounts, that their total payments were to be reduced by the amount of outstanding reclama-

tion bonds issued in payment of warrants assessed against the land, that the petitioner was to pay certain taxes on the land, and complete and maintain the reclamation works necessary to its use as a producing agricultural property, and that when all conditions had been met by both parties a deed conveying legal title from the petitioner to Weyl and Zuckerman would be made.

This agreement to sell appears to have been nothing more than an executory contract, the completion of which depended on conditions that had to be met as undertaken by each of the parties thereto. The failure of the proposing purchasers to make the required payments or to meet any other obligations imposed on them would result in the forfeiture of their rights under the contract. Likewise the failure of the petitioner to pay the taxes and construct and maintain the necessary reclamation works would relieve Weyl and Zuckerman from any liability to make the payments for which they had obligated themselves. During all the time before the execution or completion of the contract by the discharge of the several obligations accepted by each of the parties thereto the legal title of record was in the petitioner and so remained until after the organization of the reclamation district. We are of the opinion that in all these circumstances the petitioner was the owner of record, within the requirements of the reclamation laws of California, at the date of the organization of the districts.

The Commissioner also contends that in addition to Weyl and Zuckerman, there were other owners of lands included within the reclamation districts at the date of the organization thereof. Prior to the organization of the reclamation districts the petitioner deeded 2½ acres of land in each of the proposed districts to each of three of its employees and such deeds were duly recorded. Subsequently, but still prior to the organization of the districts these parcels of land were deeded back to the petitioner but such deeds were not placed of record. It appears therefore that at the date of the formation of the districts the petitioner was both the beneficial and the legal owner of such tracts and that only a title of record which had been destroyed by subsequent unrecorded deeds remained in its agents as individual owners and that such title was sufficient to satisfy the requirements of the reclamation laws of California which provide that only owners of record shall participate in the organization of reclamation districts. It appears also that there were other small tracts included within the boundaries of the several districts that were not owned by the petitioner at the time of the formation of the districts. The evidence is conclusive, however, that no assessments were placed on such lands. No assessments were placed against any lands not owned by the petitioner and for every dollar realized from the reclamation district bonds received by the petitioner in

exchange for easements and other assets, its property was subject to a lien of like amount. These facts and conclusions also apply to the districts organized in 1919. We are of the opinion that our decision in the *Rindge* appeal, *supra*, is controlling here and that no taxable income was realized by transfers of the petitioner's easements of real estate and title to personal property to the reclamation districts which it caused to be organized in 1918 and 1919.

All the terms and conditions of the contract for the sale of the Henning tract to Weyl and Zuckerman were met and discharged some time in 1919 and in that year the petitioner executed a deed conveying title to such lands to the purchaser. The petitioner contends that this transaction was completed at the date of the conveyance of title by deed. With this contention we have already agreed. We must now determine whether this sale completed in the year 1919 resulted in income to the petitioner, taxable in that year or whether a deductible loss was sustained. The petitioner contends that the fair market value or price of this tract at March 1, 1913, must be accepted as the basis for the computation of gain or loss from the completed transaction in the taxable year. If this is conceded there is a substantial loss.

It is true that the petitioner was the owner of record of the Henning tract at March 1, 1913, and that we have found that the value of such tract at that date was $180 per acre. It is also true that the petitioner's ownership at such date was subject to the conditions of a sales contract which fixed the sales price at $125 per acre, out of which the reclamation work was to be completed. All the contractual obligations of the parties to the sales contract having been discharged, title passed in the taxable year. Gain or loss from that transaction must be determined by a comparison of the fair market value at March 1, 1913, plus capital expenditures thereafter with the purchase price received. At that date, entirely regardless of the actual fair market value of $180 per acre, the petitioner's equity or interest in the tract was measured by the consideration set out in the sales contract. On the completion of that contract the petitioner received full payment in the amount determined by the terms thereof and realized from the transaction the full amount of value of his interest in the land at the basic date. We are of the opinion that within the meaning of the taxing statutes neither taxable gain nor deductible loss resulted from this transaction since the petitioner received from the completed sale neither more nor less than the value of its interest in the property at March 1, 1913, which, for the purposes of this proceeding, we hold was the fair market value of such interest at that date. The result we reach here is comparable to our decision in the *Appeal of Charles P. Hewes*, 2 B. T. A. 1279.

In May, 1919, petitioner exchanged Mandeville Island for King Island. The area of the former was 5,430 acres and of the latter 3,290 acres. Mandeville Island had against it a reclamation bonded indebtedness of $396,140 and no money to its credit in the treasury. The grantee assumed this debt. King Island was free from debt. The respondent alleges that a profit of $378,862.84 accrued to the company by this transaction. The petitioner claims that the transaction was merely an exchange of capital assets, from which no taxable gain can result, but suggests a method for the determination of the gain or loss if its contention be overruled.

Under the title " BASIS FOR DETERMINING GAIN OR LOSS," section 202 of the Revenue Act of 1918 provides as follows:

(a) That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be—

(1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date; and

(2) In the case of property acquired on or after that date, the cost thereof; or the inventory value, if the inventory is made in accordance with section 203.

(b) When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any * * *.

These provisions govern as to this item. The properties both come within the purview of "(a)" and "(a) (1)"; they are real property. King Island comes within the purview of "(b)." No differentiation is made in the act as to kinds of real property or as to whether it constitutes capital assets or not. The Commissioner is clearly right in his contention that any ascertainable gain accruing to the petitioner in connection with the transaction is taxable; conversely, any loss is deductible. The act also provides the method of ascertaining the values of the properties exchanged.

We have found as a fact that the March 1, 1913, value of the land on Mandeville Island was $170 per acre and that the cost of the reclamation work added after that date and prior to the exchange was $70 per acre.

The Commissioner and the petitioner are agreed that the value of the land on King Island was $250 per acre at the date of exchange. We have, then, the value of Mandeville Island at March 1, 1913, was $923,100, which, with the cost of improvements made between that date and the exchange in 1919 in the amount of $380,100, gives a total basic cost of $1,303,200, against which there was a bond issue liability of $396,140 which was assumed by the grantee. For this property the petitioner received King Island with an area of 3,290 acres free from debt. The value of this tract at date of transfer was $250 per acre or a total of $822,500. It appears therefore that this

transaction resulted in a loss to the petitioner in the amount of $84,560 which the petitioner is entitled to deduct from its gross income for the year 1919.

There are controversies regarding profits from land sales made by the petitioner during the taxable years. We have found the value of all such lands at March 1, 1913, and such value plus the cost of subsequent reclamation work prior to date of sale is the basis for determining gain or loss resulting from sales thereof. The terms of such sales and the amounts received therefrom may be introduced by the petitioner as elements in the computation under Rule 50 of its tax liability for the years in question.

> *Judgment will be entered on 20 days' notice, under Rule 50.*

ARUNDELL and MILLIKEN not participating.